311 Ga. 455
FINAL COPY

S21A0035.  JONES v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Alpherd Jones was convicted of felony murder in connection with the beating death of his girlfriend, LaShanda January. In this appeal, he contends that the evidence presented at his trial was insufficient to support his conviction and that the trial court erred by admitting evidence of January's diary entries under OCGA § 24-8-807 and by admitting other-acts evidence under OCGA § 24-4-404 (b). We affirm.[1]

1. (a) Viewed in the light most favorable to the verdict, the

---

[1] January died on May 18, 2017. In March 2018, a Toombs County grand jury indicted Appellant for felony murder based on aggravated battery and aggravated battery. At a trial from February 25 to 27, 2019, the jury found Appellant guilty of both counts. The trial court sentenced him as a recidivist to serve life in prison without the possibility of parole for felony murder, and the aggravated battery count merged. Appellant filed a timely motion for new trial, which he later amended with new counsel. After a hearing, the trial court denied the motion in February 2020. Appellant filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2020 and submitted for a decision on the briefs.

evidence presented at Appellant's trial showed the following. On May 4, 2017, January did not show up for her 4:00 p.m. shift at the restaurant where she worked. Around 4:15 or 4:30 p.m., a co-worker called the motel where January stayed in Vidalia. A male voice answered the phone; identified himself as January's boyfriend, whom the co-worker knew to be Appellant; and said that January had not been feeling well, took some medicine, lay down, and was not responding to him. The co-worker suggested that Appellant call for an ambulance.

About six hours later, at 10:26 p.m., Appellant called 911 and said that January was vomiting blood. When paramedics arrived at the motel room, January was lying on the bed, unresponsive. There was bruising around her eyes and on the side of her head; her face was swollen; her eyes were dilated; and there was dried, vomited blood on the bed. Both paramedics testified that, given January's injuries, they suspected that she had been beaten. When one of them asked Appellant what had happened, he said that January fell in the bathtub and hit her head, lay down on the bed because she felt

2

unwell, and later started vomiting. He also claimed that January had been talking with him moments before the paramedics arrived.

A police officer who arrived while the paramedics were tending to January observed scratches on Appellant's left arm that appeared to have been caused by fingernails. Appellant told the officer that January's injuries were "accidental." Appellant then left to pick up January's seven-year-old godson C. L., who lived with them in the motel room but was at a friend's house. Officers searched the room and found blood on a pillow, two washcloths, and the bed where January had been lying and small amounts of blood on the sink, toilet, and bathroom floor. There was no damage to the bathtub, which was dry. The officers collected three cell phones; a later download of the data from one of the phones showed that its web browser was used to search for "what to put on a black eye" at 5:32 p.m. on the day that January was injured.

When Appellant returned to the motel with C. L., an officer interviewed Appellant there; the interview was audio recorded, and the recording was later played for the jury. Appellant told the

3

following story. January, who regularly took blood pressure medication, was not feeling well that day. At one point, while she was sitting on the toilet, she fell into the bathtub and hit her head. Appellant helped her lie down on the bed, but she then fell off the bed onto the floor. She took two Aleve tablets, and they both lay down on the bed. When Appellant next checked on her, she did not answer him and vomited blood, and he called 911. When the officer said that he did not believe Appellant, Appellant admitted that he and January had argued but maintained that he had not hurt her.

Around 3:00 a.m., the officer interviewed Appellant again at a police station; this interview was video recorded, and the recording was also played for the jury. Appellant told the officer the following. He and January had been dating for about two years. She sometimes had headaches due to her high blood pressure, and on the previous day, she told him that her blood pressure was high and that she was not feeling well. She took a bath but at some point fell backward and hit her head on the soap dish that protruded from the wall of the bathtub. He helped her up, and she sat on the toilet. She then

4

vomited, and he cleaned up the bathroom. He helped her walk toward the bed, where she sat down, fell forward, hit her head on the railing at the edge of the bed, and fell between the bed and the wall. He helped her up, and they both fell asleep on the bed. When he awoke, she vomited blood, and he called 911. He insisted that he had not hurt January. When the officer asked him to tell the truth, Appellant said, "I'll talk when the appropriate time comes." After the interview, Appellant was arrested. Several days later, during an interview with another investigator, Appellant said that he and January "g[o]t along just fine," but "it was just one of those days," and he "can't take it back."

Early on the morning after January was injured, the officer interviewed C. L. at the motel. C. L. said that on the previous day, Appellant hit January hard in the stomach with his hands and threw her on the bed, that her eye was red, and that Appellant then told C. L. to go into the bathroom, where C. L. heard January say, "Al, no." Also at the motel, C. L. told a caseworker from the Division of Family and Children Services that January had been punched,

5

kicked, and dragged across the floor by her hair and that she had blood coming out of her mouth. C. L. also told the caseworker that "there was a big knife." During a forensic interview later that day, C. L. said that he saw Appellant punching January in her nose, mouth, and cheek, kicking her in the stomach, and dragging her by the hair. C. L. said he was then sent to the bathroom and heard January say, "No, Al, no, stop, stop." He also said that Appellant had a knife but put it down. C. L. briefly testified at trial that he saw January "g[e]t killed" and that she was stabbed.[2]

When January arrived at the hospital, she was unconscious, her face was swollen and bruised, she had no reflexes, and she had been intubated because she was unable to breathe on her own. CAT scans showed that January had a large bleed in her brain that was causing the brain to herniate into the brain stem. A radiologist who reviewed January's CAT scans testified that it was one of the worst brain injuries he had seen, likening it to the type of trauma caused

---

[2] Police found a "pocketknife" in the motel room but did not take it into evidence. January had no stab wounds.

by a severe car wreck. The CAT scans also showed a fractured scapula, four broken ribs, and a fractured pelvis. The radiologist testified that these injuries were inconsistent with Appellant's version of events. January was pronounced clinically brain dead two weeks later; she was then removed from her breathing machine and died moments later. An autopsy showed that her cause of death was multiple blunt force trauma injuries, and the medical examiner testified that January's injuries were not consistent with a fall in the bathtub or off a bed.

The State also presented evidence that January had written in her diary about Appellant's anger and her fear of him, which left her constantly worried. In addition, to show Appellant's criminal intent, the State presented other acts evidence about an incident in December 2004 in which Appellant hit, kicked, and stabbed his then-girlfriend, Jessica Porter, in their home after she told him that she wanted to break up; he then claimed to the police that he had accidentally stabbed her when he tried to take a knife away from her. Appellant did not testify at trial.

(b) Appellant contends that the evidence presented at his trial was legally insufficient to support his conviction under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Appellant asserts that some of the State's witnesses were not credible, but "'[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (citation omitted).

Appellant also asserts that the State failed to prove his criminal intent beyond a reasonable doubt. But when properly viewed in the light most favorable to the jury's verdict, see *Jackson*, 443 U.S. at 319, the evidence presented at trial showed that Appellant was the only person in the motel room with C. L. and January when she was injured, and C. L.'s statements established that January's injuries were the result of Appellant's violent attack. Moreover, after Appellant reported to January's co-worker that January was unresponsive, he waited several hours before calling 911. He then gave shifting accounts of how January was injured, and the medical evidence was inconsistent with his claims that her

8

injuries were accidental. Finally, the State presented evidence that Appellant had committed a similar attack against his former girlfriend.

This evidence authorized a rational jury to conclude that Appellant acted with the malicious intent to cause January bodily harm, which resulted in her death. See OCGA §§ 16-5-24 (a) (defining "aggravated battery"); 16-5-1 (c) (defining "felony murder"). Thus, the evidence presented at Appellant's trial was sufficient to authorize the jury to find him guilty beyond a reasonable doubt of felony murder based on aggravated battery. See *Jackson*, 443 U.S. at 319. See also *Valrie v. State*, 308 Ga. 563, 564-566 (842 SE2d 279) (2020) (holding that the defendant's felony murder conviction based on aggravated battery was supported by sufficient evidence, including medical evidence that contradicted his shifting stories to the police and his failure to promptly seek aid for the victim).

2. Appellant contends that the trial court abused its discretion by admitting evidence of January's diary entries. We disagree.

(a) Before trial, the State filed a motion seeking the admission of the diary entries under OCGA § 24-8-807 ("Rule 807"), the residual exception to the hearsay rule. After a pretrial hearing at which January's sister Patrie Mordon[3] testified, the trial court issued an order ruling, over Appellant's objection, that the diary evidence was admissible under Rule 807.

During the trial, Mordon testified, as she had at the pretrial hearing, that she was very familiar with January's handwriting and that January had written two particular entries in the diary, which the prosecutor had Mordon read out loud. The first entry was a letter directed to "Al," and the second was directed to "Mr. Alphred [sic] Jones." The entries expressed that during January and Appellant's relationship, Appellant said that he was sick of January and C. L., that he seemed "angry most of the time," that January was "scared" and felt like she was "walk[ing] on eggshells" around him, that

---

[3] The transcript of the pretrial hearing identifies January's sister as "Latra Mording," but when she testified at trial, she introduced herself and spelled her name as "Patrie Mordon."

Appellant always blamed her for things, that he "t[oo]k[ ] his anger and emotion out on [her] for no reason at all," and that she was "constantly worr[ied]" about doing something to make him angry.[4]

(b) Rule 807 says, in pertinent part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
> (1) The statement is offered as evidence of a material fact;
> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
>
> . . .

Rule 807 "applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *Smart v. State*, 299 Ga. 414, 421 (788 SE2d 442) (2016) (citation and punctuation omitted). A trial court should consider the totality of the circumstances in determining whether to

---

[4] The prosecutor also tendered the whole diary into evidence. Appellant has not challenged any specific portion of the diary other than the two entries that the prosecutor had Mordon read to the jury.

11

admit evidence under Rule 807. See *Reyes v. State*, 309 Ga. 660, 668 (847 SE2d 194) (2020).

When determining whether statements are sufficiently trustworthy to be admissible under Rule 807, the court considers the "'circumstances under which [the statements] were originally made'" rather than the "'credibility of the witness reporting them in court.'" *Smart,* 299 Ga. at 422 (citation omitted). In this case, the diary entries contained January's own words concerning her unhappy relationship with Appellant and his angry and controlling behavior, and there was no evidence indicating that she had a motive to fabricate her statements when she wrote them. Thus, the trial court did not abuse its discretion by determining that the diary evidence had sufficient guarantees of trustworthiness to be admissible under Rule 807. See *Smart,* 299 Ga. at 419-422 (upholding the admission under Rule 807 of the murder victim's "letters to God" and text messages to family and friends describing her abusive relationship with the appellant and noting that "[w]e cannot say that . . . [a victim's] own writings, which describe acts of

domestic violence, do not, in fact, bear an increased level of trustworthiness"). See also *Jacobs v. State*, 303 Ga. 245, 250-251 (811 SE2d 372) (2018) (concluding that statements and text messages from the murder victim to her close friends and confidantes, which described the nature of her relationship with the appellant and his "abusive, controlling, and violent behavior toward [the victim]," were sufficiently trustworthy to be admissible under Rule 807).

The statements in the diary entries also met the materiality requirement in paragraph (1) of Rule 807, because they provided details about Appellant's unwarranted anger toward January and her fear of him. The entries were therefore material as evidence of "'the nature of the relationship between [Appellant] and [January] that sheds light on Appellant's motive in committing the offenses charged.'" *Rawls v. State*, 310 Ga. 209, 215 (850 SE2d 90) (2020) (citation and punctuation omitted). See also *Smart*, 299 Ga. at 418 ("[The] testimony was relevant to help the jury understand why [the appellant] might have used violence against [the victim].").

13

Moreover, Appellant has not shown under paragraph (2) of Rule 807 that there was other evidence that the State could have procured with reasonable efforts that would have been more probative to show Appellant's motive than the diary entries, which provided January's firsthand account of her relationship with and fear of Appellant before she was beaten to death in their motel room. See *Smart*, 299 Ga. at 422 (noting that a domestic-violence victim's own writings and text messages to family and friends may be "highly probative," given the "often-secretive nature of domestic violence"). Accordingly, the trial court did not abuse its discretion by admitting the evidence under Rule 807.[5]

---

[5] Appellant also argues that the diary entries were not properly authenticated because the evidence establishing how the State came into possession of the diary was inconsistent. At the pretrial hearing, Mordon testified that she got the diary from her mother, who got it from a detective who was investigating January's death. At trial, Mordon testified that she got the diary from "Ms. Betty," whom further evidence showed to be the director of the domestic violence center to which the motel owner brought January's belongings from the motel room after the incident. This inconsistency in Mordon's testimony, however, is immaterial to the issue of whether the diary entries were adequately authenticated. Mordon testified that she was very familiar with her sister January's handwriting and identified January's handwriting in the pertinent diary entries. Moreover, the diary entries referenced Appellant's relationships with January and C. L. and were directed

14

3. Finally, Appellant contends that the trial court erred by admitting other-act evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)"). We see no abuse of discretion.

(a) Before trial, the State filed a notice of intent to offer other-acts evidence showing that in December 2004, Appellant beat and stabbed his former girlfriend, Jessica Porter. After a pretrial hearing at which the State presented testimony from Porter and Detective Charles Whitaker, who investigated the attack, the trial court issued an order ruling, over Appellant's objection, that the other-acts evidence was admissible for the purposes of showing intent and the absence of mistake or accident.

At trial, Porter testified to the following. She had been in a relationship with Appellant and was living with him in December

to "Al" and "Mr. Alphred [sic] Jones." Thus, the trial court did not abuse its discretion by concluding that the State presented sufficient evidence that the diary entries were written by January. See OCGA § 24-9-901 (b) (2) & (4) (stating that the requisite authentication of evidence may be satisfied by, among other things, "[n]onexpert opinion as to the genuineness of handwriting, based on familiarity not acquired for purposes of the litigation," and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"). See also *Smith v. State*, 300 Ga. 538, 540-541 (796 SE2d 666) (2017).

2004. On December 20, after she told him that she was breaking up with him, he hit her on the head with a liquor bottle, knocking her down between the bed and the wall, and proceeded to beat, kick, and stomp on her, saying that she was going to die that day. When Porter tried to escape, Appellant dragged her toward the kitchen, where he stabbed her in the back several times with a butcher knife before the police arrived and arrested him. Porter was taken to a hospital and treated for several days for stab wounds and a concussion. Detective Whitaker testified that he interviewed Appellant, who claimed that Porter was "suicidal," that she "liked to play with knives," that she "was always beating him up and threatening him with weapons," that she had a knife while they were arguing that day, and that when he tried to take it from her, he "accidentally stabbed her in the back." The State also tendered into evidence certified copies of Appellant's June 2005 guilty pleas to aggravated assault and false imprisonment, for which he was sentenced to serve eight years in prison. During the final jury charge, the trial court instructed that the State offered the other-acts evidence to show intent and that the

16

jury was to consider the evidence only insofar as it related to that issue.[6]

(b) Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence may be admissible for other purposes, including to prove intent. OCGA § 24-4-404 (b). For such evidence to be admissible, the proponent of the evidence must show three things:

> (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

---

[6] As mentioned earlier, in its pretrial order, the trial court had ruled that the evidence was admissible for the purposes of showing both intent and absence of mistake or accident. When the other-acts evidence was admitted during the trial, the court gave the jury a limiting instruction saying that the evidence was admissible only for the purpose of showing absence of mistake or accident. During the charge conference, the trial court told the parties that it would not give a jury instruction on the defense of accident, but the court noted that the other-acts evidence was still admissible to show intent, and the court so instructed the jury in the final charge. Because we conclude below that the other-acts evidence was admissible to show Appellant's intent (and because the purposes of intent and absence of mistake or accident are closely related in this case), we need not separately address whether the evidence was admissible for the additional purpose of showing absence of mistake or accident.

17

*Kirby v. State*, 304 Ga. 472, 479 (819 SE2d 468) (2018). Appellant concedes that the State satisfied the third part of this test, so we will address only the first and second parts.

(i) To determine whether other-acts evidence is relevant to a non-character issue, we look to the definition of "relevant evidence" in OCGA § 24-4-401, which says that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevance is thus "a binary question — evidence is either relevant or it is not." *Kirby*, 304 Ga. at 480.

To prove the charged crimes of aggravated battery and felony murder based on that offense, the State had to show that Appellant had the malicious intent to cause bodily harm to January. See OCGA § 16-5-24 (a). Appellant's intent was a major issue at trial, not only because he pled not guilty but also because he had repeatedly claimed that he did not hurt January and suggested that her injuries resulted from accidental falls while she was ill. See

18

*Thompson v. State*, 308 Ga. 854, 858 (843 SE2d 794) (2020). The evidence that Appellant previously acted with malicious intent to injure Porter when he beat her badly enough to cause a concussion and stabbed her several times with a butcher knife made it more probable that he possessed the same intent to commit aggravated battery against January, so the first part of the Rule 404 (b) test was satisfied. See *Strong v. State*, 309 Ga. 295, 309 (845 SE2d 653) (2020). See also *Olds v. State*, 299 Ga. 65, 72 (786 SE2d 633) (2016) ("[E]vidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent[.]").

(ii) The second part of the Rule 404 (b) test is governed by OCGA § 24-4-403 ("Rule 403"), which says in pertinent part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The exclusion of evidence under Rule 403 "is an extraordinary remedy which should be used only sparingly." *Hood v. State*, 299 Ga. 95, 102-103 (786 SE2d 648) (2016) (citations and punctuation omitted).

When other-acts evidence is presented to show intent, Rule 403 requires a case-by-case, "'common sense assessment of all the circumstances surrounding . . . the extrinsic act and the charged offense.'" *Kirby*, 304 Ga. at 481 (citation omitted). These circumstances include the prosecutorial need for the other-acts evidence, the other act's overall similarity to the charged crimes, and its temporal remoteness. See id.

In this case, the State had a significant need for the other-acts evidence. Most of the evidence indicating that Appellant beat January was circumstantial; the only eyewitness was a young child; and Appellant maintained during his police interviews that he never attacked January and that she was injured by accidental falls. To satisfy its burden of proof and to rebut Appellant's explanation for how January was injured, the State needed evidence that her death was not accidental and that Appellant harmed her with malicious intent. See *Harrison v. State*, 310 Ga. 862, 868 (855 SE2d 546) (2021); *Thompson*, 308 Ga. at 859.

As for similarity, the other-acts evidence showed that

Appellant beat, kicked, and dragged his then-girlfriend Porter in their home after an argument, which aligns with C.L.'s account of how Appellant attacked January. And as in this case, Appellant claimed that Porter's stabbing injuries were accidental. Appellant points out that he used a liquor bottle and a knife in his attack on Porter, but those differences do not undermine the significant similarities between the incidents. See *Kirby*, 304 Ga. at 484. In addition, C.L. reported to the caseworker and the forensic examiner that Appellant had a knife during his attack on January.

Although the 2004 incident occurred more than 12 years before January's murder, the incident was "not so remote as to be lacking in evidentiary value." *Kirby*, 304 Ga. at 434 (citation and punctuation omitted). Moreover, Appellant was sentenced to serve eight years in prison for his convictions related to the attack on Porter. While the record does not clearly reflect how much prison time Appellant actually served, he was likely incarcerated for a substantial portion of the time between that incident and January's murder. See id. ("[T]he prior crime need not be very recent,

21

especially where a substantial portion of the gap in time occurred while the defendant was incarcerated." (citation and punctuation omitted)).

The evidence of the 2004 incident was prejudicial, as is all inculpatory evidence, but in light of its significant probative value, it was not a "'matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Kirby*, 304 Ga. at 484 (citation omitted). See also *Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; 'it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion.'" (citation omitted; emphasis in original)). And the jury learned that Appellant had already admitted his guilt and was convicted and sentenced to eight years in prison for attacking Porter, making it less likely that the jury would want to punish him for the other act rather than for the charged crimes. See *Kirby*, 304 Ga. at 485. In addition, the trial court instructed the jury during the final charge that the other-acts evidence was to be considered only for the limited purpose of

showing Appellant's intent. See *Harrison*, 310 Ga. at 868.

For these reasons, the trial court did not abuse its discretion in determining that the probative value of the other-acts evidence was not substantially outweighed by its prejudicial effect. Accordingly, the court properly admitted the other-acts evidence under Rule 404 (b). See, e.g., *Harrison*, 310 Ga. at 869; *Thompson*, 308 Ga. at 860.

*Judgment affirmed. All the Justices concur.*


Decided May 17, 2021.

Murder. Toombs Superior Court. Before Judge Reeves.

*Randall P. Sharp*, for appellant.

*John A. Fitzner III, District Attorney, Jessica B. Wilson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.