NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 17, 2024

S23A1089.  SHELLMAN v. THE STATE.

PINSON, Justice.

Appellant Isaac Antonio Shellman was convicted of malice murder and possession of a firearm by a convicted felon during a crime in connection with the shooting death of his wife, Shanelle Shellman.[1] On appeal, Shellman contends that (1) the evidence was

---

[1] The crimes occurred on July 13, 2016. On October 19, 2016, a Chatham County grand jury indicted Shellman for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault by family violence (Count 3), possession of a firearm during the commission of a felony (Count 4), violation of the Georgia Controlled Substances Act (Count 5), and possession of a firearm by a convicted felon during a crime (Count 6). Shellman was tried by a jury from April 22 to 25, 2019. The trial court granted Shellman's motion for directed verdict as to Count 5, and the jury found Shellman guilty on all remaining counts (Counts 1 through 4 and Count 6). Shellman was sentenced to consecutive sentences of life without parole for Count 1, five years in prison on Count 4, and 15 years in prison on Count 6. Count 3 and Count 1 merged and Count 2 was vacated by operation of law. Shellman filed a timely motion for new trial and amended that motion through new counsel. Following a hearing, the trial court found that Shellman's sentence for Count 4 should merge into Count 6 but denied the motion for new trial on other grounds. Shellman was re-sentenced on May 18, 2023, merging Count 4 into

insufficient to sustain his convictions as a matter of constitutional due process and under OCGA § 24-14-6, and (2) the trial court abused its discretion by admitting into evidence under OCGA § 24-8-807 (Rule 807) a journal found in a closet at the crime scene.

These claims fail. The evidence was sufficient to support Shellman's convictions, and the jury was authorized to reject as unreasonable Shellman's alternative hypothesis that he was framed by a police officer. And the trial court did not abuse its discretion in admitting the journal entries under Rule 807: The entries had sufficient guarantees of trustworthiness because they detailed in Shanelle's own words her volatile relationship with Shellman, and there was no evidence that she had a motive to fabricate her statements when she wrote them. Those statements were material because they provided evidence about the nature of the relationship that sheds light on Shellman's motive in committing the offenses charged. And

Count 6. Shellman filed a timely notice of appeal. The case was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

Shellman has not shown that the State could have reasonably procured other, more probative evidence of motive than the victim's own writings describing acts of domestic violence, or that the interests of justice were not best served by the journal's admission. So we affirm his convictions and sentence.

1. Viewed in the light most favorable to the verdict, the evidence at trial showed the following. On January 13, 2016, Shanelle's two minor children heard her scream "get off of me," followed by "a loud bump" from a bedroom in their home. The children went to the bedroom, saw Shanelle and Shellman lying on the floor, and called 911. When the police arrived, the children took them to the bedroom where "there was blood everywhere." Officers found Shanelle and Shellman on the bedroom floor, both having suffered gunshot wounds to the head, and Shellman had a gun in his right hand. Shanelle was dead, but Shellman still had a pulse and was breathing. Emergency medical personnel took him to a hospital.

At the hospital, an investigator recovered three live .380-caliber rounds from Shellman's pants pocket. Once a search warrant

was issued, investigators and crime scene technicians entered the home. They recovered the gun that had been in Shellman's hand, three live rounds from that gun, a bullet, and two spent shell casings from the crime scene. After an autopsy was performed, a medical examiner recovered the bullet from Shanelle's head and submitted it to the GBI. A GBI firearms expert determined that the gun found in Shellman's hand worked properly and that it fired the bullet and shell casings found at the crime scene as well as the bullet recovered from Shanelle's head. The gun used .380-caliber ammunition—the same type of ammunition that was found in Shellman's pants pocket.

Investigators also recovered a journal from a closet in the bed-room where Shanelle and Shellman were found. At trial, the State presented evidence that Shanelle had written in this journal in the days before the murder about her marital troubles with Shellman and her belief that Shellman no longer loved her. The journal also contained allegations of both Shanelle and Shellman's infidelity and recorded that Shellman and Shanelle had frequent arguments,

Shellman was "mean" to Shanelle, and he was "violent for nothing."

Many witnesses testified that Shellman was controlling and abusive towards Shanelle. Shanelle's best friend, Tiyisha Grisby, testified that Shanelle called her one night and asked for Grisby to pick her up after Shellman shoved Shanelle's head into a wall and punched her while calling her "b***h[ ]" and "hoe[ ]." Once, Shellman put a gun to Shanelle's head and threatened to kill her, telling her that if she ever left, he would find her, kill her, and bury her body where it could not be found. On several occasions, Shanelle told Grisby that she had "bruises . . . all on her body," because she and Shellman got into frequent arguments and Shellman would punch her, pull her hair, and spit on her.

Shanelle's mother described Shanelle and Shellman's marriage as "an up-and-down relationship," explaining that Shanelle told her that she planned to leave Shellman. A week before the murder, Shanelle told her mother that she and Shellman had "problems," that they "had been fighting," and that Shellman had "hit her," "beat her and pulled her hair out." Shanelle's neighbor testified that about a

5

month before the murder, Shanelle went to the neighbor's house and told her "he's trying to kill me, help me, he's trying to kill me." Shanelle used the neighbor's phone to call 911 and report that Shellman assaulted her and that she feared for her life. Shanelle told the responding officer that Shellman became upset because he saw a picture of her with another man from several years prior.

Shellman testified in his own defense at trial. When asked about his relationship with Shanelle, Shellman explained he and Shanelle "fussed like twice," but were "loving each other right," and that they were not "fighting," and he disputed that he ever put a gun to Shanelle's head. Shellman further testified that on the day of the murder, he and Shanelle were talking in their room, and then he went out to the front porch to smoke a cigar. According to him, while outside, he saw a police officer at his neighbor's house and started speaking to the officer as another officer pulled up in a car and stepped out with a gun in his hand. Shellman testified that when the second officer arrived, the first officer began speaking to Shellman in an aggressive manner, but Shellman remained respectful.

6

Shellman said that the first officer then shot him in the face, and Shellman fell down on the porch, bleeding. According to Shellman, one of the officers placed a gun on the right side of Shellman's pants. Per Shellman's testimony, an officer then stepped on his face as the officer went inside his house. Shellman testified that he lost consciousness and that he had no knowledge of anything that happened between that moment and when he awoke, months later. Shellman denied killing his wife, attempting to commit suicide, or owning a gun at the time of his wife's death.

2. Shellman claims that the evidence was not sufficient to support his convictions for malice murder or possession of a firearm by a convicted felon during a crime, either as a matter of constitutional due process, see *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), or under OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). We address each claim in turn.

(a) When evaluating a due process challenge to the sufficiency of the evidence, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Peacock v. State*, 314 Ga. 709, 714 (2) (b) (878 SE2d 247) (2022) (citation and punctuation omitted).  See also *Jackson*, 443 U.S. at 319 (III) (B). In doing so, we "leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

In support of his claim that the evidence was not sufficient as a matter of due process, Shellman offers only a conclusory suggestion that "the absence of evidence elucidating what happened" was not a sufficient basis for the jury's finding of guilt. But the evidence summarized above authorized the jury to find Shellman guilty beyond a reasonable doubt of malice murder and the related firearm-possession count. Shanelle's two children testified that they heard

8

Shanelle scream "get off of me," then heard a loud "bump," after which they went into the bedroom and found Shanelle and Shellman lying on the floor with severe injuries and Shellman with a gun in his hand. And testimony from responding police officers was consistent with the children's testimony that both Shellman and Shanelle were on the bedroom floor. Further, a GBI firearms expert testified that all the ballistics evidence found at the crime scene and the bullet removed from Shanelle's head were fired by the gun in Shellman's hand, and that ammunition found in Shellman's pants pocket also matched the ballistics evidence. See *Smith v. State*, 315 Ga. 357, 359-361 (1) (882 SE2d 289) (2022) (evidence was sufficient to support malice murder conviction where two witnesses identified the defendant as holding a rifle near the victim and a firearms expert matched shell casings found at the crime scene and the bullet that killed the victim with a rifle found near the defendant's house). Finally, multiple witnesses testified about the tumultuous nature of Shellman and Shanelle's relationship and Shellman's history of

9

abusing Shanelle. This evidence was sufficient to support Shellman's convictions as a matter of constitutional due process.

(b) A conviction can rest on circumstantial evidence alone if that evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. See *Davenport v. State*, 309 Ga. 385, 388 (1) (846 SE2d 83) (2020). Not every hypothesis is a "reasonable" one, and the evidence "need not exclude every *conceivable* inference or hypothesis," only the reasonable ones. *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted). "The questions whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses are for the jury." *Willis v. State*, 315 Ga. 19, 24 (2) (880 SE2d 158) (2022). See also *Merritt v. State*, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009). We will not disturb the jury's findings on those questions unless they are "insupportable as a matter of law." *Graves*, 306 Ga. at 487 (1) (citation and punctuation omitted).

Shellman claims that the evidence was not sufficient under

OCGA § 24-14-6 because it did not exclude the hypothesis he offered at trial: that he was shot by a police officer outside of his home on the front porch, after which the officer placed a gun in Shellman's hand and stepped on his face, and Shellman lost consciousness.

Even assuming the evidence against Shellman was entirely circumstantial, the evidence authorized the jury to reject Shellman's alternative hypothesis as unreasonable. As recounted above, Shellman's two children and the responding officers all testified that Shellman and Shanelle were lying wounded on the bedroom floor, not on the front porch as he claimed. And the bullet recovered from Shanelle's body matched not only the gun in Shellman's hand, but also the ammunition in his pocket. That evidence authorized the jury to reject as unreasonable Shellman's claim that he was actually shot outside the house, lost consciousness, and was then moved into the bedroom and planted with incriminating ballistics evidence. Thus, the evidence was sufficient under OCGA § 24-14-6 to support Shellman's convictions. See *Muse v. State*, 316 Ga. 639, 650 (2) (889 SE2d 885) (2023) (explaining that "where the jury is authorized to

find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law") (citation and punctuation omitted).

3. Shellman also contends that the trial court abused its discretion by admitting evidence of Shanelle's journal entries under Rule 807 because the entries failed to meet the requirements of that rule. "[A] trial court's decision to admit hearsay evidence is reviewed for an abuse of its discretion." *Kennebrew v. State*, 317 Ga. 324, 335 (4) (893 SE2d 96) (2023) (citation and punctuation omitted).

(a) Before trial, the State filed a notice of its intent to offer hearsay statements from Shanelle's journal under Rule 807 and later filed a proffer of the statements. After a hearing and over Shellman's objection, the trial court ruled that certain portions of the journal were admissible under "Rule 807 if offered in the proper context and procedurally."

At trial, the State established that police found the journal in the closet in the bedroom of the crime scene. And Shanelle's mother

12

identified the handwriting in the journal as Shanelle's, explaining that she recognized Shanelle's handwriting because she had received cards and letters from her.

The State published the admitted portions of the journal to the jury. The journal showed Shanelle's thoughts regarding her relationship with Shellman in the days before the murder. Shanelle wrote that she was unhappy, and that Shellman treated her "like s**t," made her "feel like nothing," was "violent for nothing," and "no longer love[d] [her.]" The entries also expressed that Shellman and Shanelle had frequent "arguments [stemming] from [Shellman's] irrational thinking," that Shellman accused Shanelle of being unfaithful and lying "about everything" and "for nothing," and that because he did not believe her, she was "scared of what may happen."

(b) Rule 807 is often referred to as the residual hearsay exception. Under this rule, a statement "not specifically covered by any law" but having "equivalent circumstantial guarantees of trustworthiness" is not excluded by the hearsay rule if the court determines that "(1) [t]he statement is offered as evidence of a material fact; (2)

13

[t]he statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) [t]he general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence." OCGA § 24-8-807. In assessing whether evidence is admissible under Rule 807, a trial court "should consider the totality of the circumstances." *Jones v. State*, 311 Ga. 455, 460 (2) (b) (858 SE2d 462) (2021).

On appeal, Shellman does not contend that the journal entries were inadmissible under Rule 807 because they were "specifically covered" by another law, OCGA § 24-8-807, so we consider here only whether the entries had sufficient guarantees of trustworthiness and whether the three requirements of Rule 807 were satisfied. See *Kennebrew*, 317 Ga. at 335 (4) n.8.

The trial court did not abuse its discretion in determining that the journal entries had sufficient guarantees of trustworthiness. Whether a statement is sufficiently trustworthy is determined by "the circumstances under which the statements were originally

14

made rather than the credibility of the witness reporting them in court." *Jones*, 311 Ga. at 460 (2) (b) (cleaned up). Here, the entries detailed in Shanelle's "own words" her volatile relationship with Shellman, and there was no evidence suggesting that Shanelle "had a motive to fabricate her statements when she wrote them." Id. Further, the journal entries' depiction of Shanelle and Shellman's relationship was consistent with testimony from Shanelle's mother, best friend, and neighbor, who all highlighted the Shellmans' tumultuous relationship and Shellman's abuse and jealousy. See *Tanner*, 301 Ga. at 856 (1) (statements had sufficient guarantees of trustworthiness in part because "the statements were consistent with other evidence").[2]

---

[2] Shellman also suggests that the journal entries were not properly authenticated. But Shanelle's mother testified that she recognized Shanelle's handwriting from handwritten Mother's Day cards and letters. That is enough. See OCGA § 24-9-901 (b) (2) & (4) (stating that the requisite authentication of evidence may be satisfied by, among other things, "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation," and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"). See also *Jones*, 311 Ga. at 461 (2) (b) n.5 (indicating that victim's sister's familiarity with and identification of victim's handwriting helped establish that diary entries were written by the victim); *Smith v. State*, 300 Ga.

The journal entries also met the requirements of Rule 807 (1)-(3). The entries were material because they offered firsthand details in Shanelle's own words about the nature of her and Shellman's relationship, including allegations of infidelity and dishonesty, the couple's frequent arguments, Shellman's anger, jealousy, and violence, and Shanelle's sentiment that she was unhappy and that Shellman "no longer love[d] [her]" in the days leading up to the murder. In other words, the entries provided "evidence of the nature of the relationship between" Shellman and Shanelle "that sheds light on" his "motive in committing the offenses charged." *Jones*, 311 Ga. at 461 (2) (b) (cleaned up). See also *Smart v. State*, 299 Ga. 414, 418 (2) (a) (788 SE2d 442) (2016) ("[The] testimony was relevant to help the jury understand why [the appellant] might have used violence against [the victim].").

---

538, 540-541 (1) (b) (796 SE2d 666) (2017) (holding accomplice's testimony identifying the defendant's handwriting because "he was familiar with" defendant's handwriting, and because "many of the letters were either directly given to him by [the defendant] or were delivered by a third party at [the defendant's] request," adequately established letters were written by the defendant).

Shellman also has not shown that there was "other evidence that the State could have procured with reasonable efforts that would have been more probative to show" Shellman's motive than the journal entries, which provided Shanelle's "firsthand account of her relationship with" Shellman. *Jones*, 311 Ga. at 461 (2) (b). As for the entries' probative value, when, as here, an alleged victim of domestic violence is deceased, the victim's "own writings" describing acts of domestic violence may be "highly probative" "in light of the often-secretive nature of domestic violence." *Smart*, 299 Ga. at 422 (3). Although other witnesses also testified in general terms about the nature of Shellman and Shanelle's relationship, it was within the trial court's discretion to conclude that Shanelle's own contemporaneous account was more probative than any third party's testimony.

Finally, Shellman offers no argument that the interests of justice were not best served by the admission of the journal entries. Thus, the trial court did not abuse its discretion in admitting the journal entries under Rule 807.

*Judgment affirmed. All the Justices concur.*