NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 4, 2025

S25A1207.  MERRITT v. THE STATE.

WARREN, Presiding Justice.

In May 2023, Richard Merritt was convicted of the malice murder of his mother, Shirley Merritt, and possession of a knife during the commission of a crime.  He appeals these convictions, arguing that the evidence was not sufficient to support the convictions, that counsel provided ineffective assistance related to his cross-examination of Merritt's ex-wife, that counsel provided ineffective assistance in closing argument, that he is entitled to a new trial because the trial court failed to make the necessary findings to justify his legs being shackled throughout trial, that the State committed a violation under *Brady v. Maryland*, 373 US 83 (1963), and that the cumulative effect of instances of counsel's deficient performance and trial court errors requires a new trial.

Because the evidence was sufficient to support his convictions; Merritt has failed to show that trial counsel's performance was deficient in any of the ways he alleges; Merritt has waived his claims based on his shackling and on *Brady*; and there are no instances of trial counsel deficiency or trial court error to consider cumulatively, we affirm Merritt's convictions.[1]

1. The following evidence was presented at trial. On January 18, 2019, Merritt, who was an attorney, pled guilty to 34 felony counts in Cobb County, including theft, elder exploitation, and forgery, related to his theft of money from his clients.[2] He was

---

[1] Shirley was killed in February 2019. In June 2019, a DeKalb County grand jury indicted Merritt for malice murder, two counts of felony murder, two counts of aggravated assault, and one count of possession of a knife during the commission of a felony. At a jury trial in May 2023, the jury found Merritt guilty on all counts. Merritt was sentenced to life in prison without parole for malice murder and a consecutive five years for possession of a knife during the commission of a felony. All other counts were vacated or merged. Merritt timely filed a motion for new trial in June 2023 and amended it with new counsel in September 2024. In January 2025, after an evidentiary hearing, the trial court denied Merritt's motion. Merritt filed a timely notice of appeal. The appeal was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

[2] In January 2018, this Court accepted Merritt's voluntary surrender of his license based on his admission that he failed to promptly disburse settlement funds to one of his clients. See *In the Matter of Merritt*, 302 Ga. 874

sentenced to serve 15 years in prison and 15 years on probation. He was not taken into custody immediately after his sentencing but was released subject to GPS monitoring and directed to turn himself in to begin serving his sentence by 5:00 p.m. on February 1, 2019. Although Merritt had been married, by the time of his sentencing, he and his former wife, Jennine Minicozzi, were divorced, and Merritt lived with his mother.

On the morning of February 1, Merritt met Minicozzi and their daughter at a doctor's office for their daughter's appointment. According to Minicozzi, Merritt's "demeanor was very strange" at the doctor's appointment and he "was very quiet and didn't look at anybody or say anything." Merritt's GPS monitoring data showed that after the doctor's appointment, he returned to Shirley's house, arriving around 9:30 a.m. Five hours after that, at about 2:30 p.m., he left the house, driving toward Tennessee. Merritt drove Shirley's car, rather than his own, and he took Shirley's cell phone, as well as

---

(2018).

3

his own. The last time either phone was active was around 4:00 p.m. on February 1. At 4:14 p.m., Merritt cut off his GPS ankle monitor at a truck stop.[3] The person who was monitoring his ankle monitor got an alert and arrived at the truck stop around 4:40 p.m. The monitor was in a trash can, and Merritt was gone. Merritt did not report to begin his prison sentence at 5:00 p.m. as required.

After Merritt failed to report on February 1, Merritt's lawyer for the theft charges called Minicozzi. She called Mike Jefcoat, a close family member of Shirley, who tried to reach Shirley, but Shirley did not respond to calls or text messages. Early the next morning, Minicozzi and Jefcoat went to Shirley's house. Using Minicozzi's key, Jefcoat entered the house and found Shirley dead at the bottom of the stairs to the basement. She had stab wounds on her back, torso, neck, and face, which an expert later concluded were consistent with having been made with a kitchen knife. The blade of the knife, which was longer than three inches, had broken off in

---

[3] Merritt later testified that he "got rid" of both cell phones "around the time that [he] cut the ankle monitor off."

4

her face and the handle was found near her body. She had also suffered a blunt-force injury that was consistent with having been made by a 35-pound dumbbell that was found near her body. Her cause of death was a combination of "a blunt impact injury and stab wounds." There were no signs of forced entry or struggle in the house. Law enforcement began a search for Merritt, and he was found and arrested seven months later in September 2019; he had been living under a false identity in Nashville, Tennessee.[4]

Merritt testified at trial, giving the following account of Shirley's death. In January 2019, leading up to his sentencing for the theft crimes, Merritt believed that "somebody was out to get [him]." He noticed that suspicious cars began driving by Shirley's house, and he and Shirley had gotten phone calls from unknown callers who hung up. Also, a cartoon mocking the judge and

---

[4] While in prison, Merritt sent letters to his brother saying that "any fingerprints that may exist are easily explained" because the dumbbells were his and he "regularly use[d] the knife in question to prepare food." At trial, there was no testimony about fingerprints on the dumbbell, but an expert testified that they were not able to get sufficient contact DNA to test from the dumbbell. An expert also testified that they were not able to retrieve any fingerprints from the knife handle.

prosecutors involved in Merritt's theft case was sent to Shirley's and Minicozzi's houses.[5]   According to Merritt, on the afternoon of February 1, two men knocked on the door of Shirley's house.  When Merritt answered the door, the men pointed a gun at him and ordered him to let them inside.  He complied.  The men told him to go to the basement.  One of the men kept a gun pointed at Merritt, while the other man pointed his gun at Shirley.  All four people began walking down the stairs to the basement, and Shirley began to cry.  One of the men told her to be quiet and pushed her down the rest of the stairs.  She hit her head on the wall and had trouble getting up.  The man got a dumbbell from the basement and "proceeded to bludgeon [her] with it"; then he went upstairs, got a kitchen knife, and stabbed her with it "repeatedly."  The men then showed Merritt pictures of Minicozzi and their children and said, "If

---

[5] The cartoon was admitted into evidence at trial.  The cartoon featured drawings of people in a courtroom, with four men, labeled as Merritt, the judge, the district attorney, and the assistant district attorney, each saying something indicating that although Merritt harmed his victims, he would not be punished.

you say a single word, they're next." The men left, and Merritt fled. He did not report this incident to the police, warn Minicozzi and the children, or report to serve his prison sentence as required, because he was afraid the men were watching him and would hurt Minicozzi and the children if he spoke to anyone. He did not know the two men, but he assumed they were motivated to attack him because of his theft crimes and he believed that they had "cased the house before" the attack because they seemed to know where the basement was.

The jury found Merritt guilty of murdering his mother and all of the other charged crimes.

2. Merritt asserts that the evidence was not sufficient as a matter of constitutional due process to support his convictions because the evidence was circumstantial and no DNA or fingerprints linked him to the crimes. See *Jackson v. Virginia,* 443 US 307, 318–19 (1979). When assessing this claim, "we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant

guilty beyond a reasonable doubt of the crimes of which he was convicted." *Moulder v. State*, 317 Ga. 43, 46–47 (2023).

"[T]he fact that the State did not produce certain types of evidence does not mean that the evidence was insufficient. Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Jones v. State*, 319 Ga. 758, 761–62 (2024) (cleaned up). As detailed above, ample evidence of Merritt's guilt was presented at trial, including GPS data and Merritt's own testimony showing that Merritt was with his mother on the day she was stabbed and bludgeoned to death, which was the same day Merritt was supposed to begin serving his prison sentence, and evidence that after her death, Merritt fled to another state with his mother's car and cell phone, cut off his ankle monitor and "got rid" of the cell phone, and began living under the guise of a fake identity. The evidence presented at trial was sufficient to support Merritt's convictions for

murdering his mother and possessing a knife during that murder.[6] See, e.g., *Young v. State*, 305 Ga. 92, 94 (2019) (holding that the evidence, which included evidence that the appellant and victim had "participated in an unsuccessful mediation" as part of their "contentious divorce" days before the victim's death and the appellant fled and "remained in hiding until he was arrested," was constitutionally sufficient to support the appellant's murder conviction).

To the extent Merritt also argues that the evidence was not sufficient to support his convictions under OCGA § 24-14-6, we similarly reject that argument. OCGA § 24-14-6 says: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the

---

[6] See OCGA § 16-5-1(a) ("A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being."); OCGA § 16-11-106(b) ("Any person who shall have on or within arm's reach of his or her person … a knife having a blade of three or more inches in length during the commission of, or the attempt to commit: (1) Any crime against or involving the person of another … and which crime is a felony, commits a felony … .").

9

accused." "Whether a hypothesis raised by the defendant is reasonable is a question committed principally to the factfinder." *Peacock v. State*, 314 Ga. 709, 714 (2022).

The hypothesis offered by Merritt at trial was that victims of the theft crimes were threatening him, including by sending a cartoon, and two men associated with these victims killed his mother. The jury was authorized to reject this hypothesis, which was supported only by Merritt's testimony, as unreasonable, particularly because the evidence showed that there were no signs of struggle in Shirley's house and Merritt's story required the jury to believe that although the men brought guns to the house, they used household items to kill Shirley, and although they were angry at Merritt (not his mother), they brutally murdered her and left him unharmed and free to leave. See, e.g., *Shellman v. State*, 318 Ga. 71, 76 (2024) (holding that the jury was authorized "to reject as unreasonable" the appellant's claim that he was shot outside the house, "lost consciousness, and was then moved into the bedroom and planted with incriminating ballistics evidence"). Thus,

Merritt's claim fails.

3. Merritt argues that counsel provided ineffective assistance in three ways related to his cross-examination of Minicozzi. Specifically, Merritt argues that counsel provided ineffective assistance by not objecting to—and instead asking further questions about—Minicozzi's testimony that Merritt had been violent toward her, that Merritt's crimes "ruined" her life and caused her "trauma," and that their daughter's doctor "didn't like" Merritt's "aura" and "behavior" at the appointment on the day of the murder.

To establish his claim of ineffective assistance of counsel, Merritt must show both that trial counsel's performance was professionally deficient and that he was prejudiced as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984).

> Trial counsel's performance was deficient if it was objectively unreasonable ... considering all the circumstances and in the light of prevailing professional norms. And to prove prejudice under *Strickland*, a defendant must establish a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different.

*Burke v. State*, 320 Ga. 706, 708 (2025) (cleaned up). "If [the

11

appellant] fails to establish one of these two prongs, we need not examine the other." *Troutman v. State*, 320 Ga. 489, 494 (2024).

(a)(i) During cross-examination, counsel asked Minicozzi if Merritt had a "reputation for being a violent man." She responded: "No. But he had a very, very scary temper." Counsel clarified: "Okay. But as you said, he did not have a reputation for physical violence, correct?" Minicozzi responded: "He was physically violent with me once" and explained that "towards the end of [their] marriage," they had an argument and Merritt "pushed [her] to the ground and [she] hit [her] head on the bed." Counsel then asked some follow-up questions, eliciting Minicozzi's admission that she did not call the police or make a report. She also testified that she did not file for divorce after that incident but later filed for divorce because "he ruined our lives" by committing the theft crimes.

Counsel noted that he had not "seen a single report where [Minicozzi] mentioned that there was an issue in [their] relationship," and Minicozzi responded that she "didn't talk about it because it was very scary." She testified that "in the couple of

12

months before he was arrested" for the theft crimes, "his behavior changed" and "he started drinking very heavily, and showing us the temper that was very scary." She described a night when she and her son were scared and "looking for somewhere to run and hide" from Merritt.

Counsel again elicited Minicozzi's admission that she did not mention Merritt's alleged violence to the police or "anybody," and again, she explained that she did not tell anyone "because it was so scary." She also testified that she "blocked a lot of it out" and that she only recently remembered the incidents because she had been "working on it intensely in therapy, and a lot of the trauma … surfaced later as [she] dealt with the years of trauma that he put [her] through." Counsel asked Minicozzi if she "hate[d]" Merritt, and she responded, "Of course."

Counsel then asked Minicozzi more about Merritt's behavior at the medical appointment, and she testified that at the end of the appointment the doctor walked her and her daughter to their car because the doctor "didn't like the way [Merritt's] aura was and his

13

behavior." After this testimony, Merritt's trial counsel elicited Minicozzi's admission that she did not "make any type of report of [Merritt] acting strange or being scared."

During closing argument, counsel acknowledged Minicozzi's allegation of Merritt's violence, pointing out that Minicozzi said she had only recently remembered these incidents in therapy. Counsel asserted that "repressed memories are unreliable" and urged the jury to apply "common sense," emphasizing that Minicozzi "hates her ex-husband" and "wanted to see him prosecuted."

(ii) At the motion for new trial hearing, trial counsel testified that he asked Minicozzi about Merritt's reputation for violence because Merritt told him that Minicozzi "would not say that he was violent towards her." Minicozzi's answer surprised counsel, but he did not object or argue that her answer was non-responsive because he had "dealt with" Minicozzi before and thought that the best approach was to handle it "without the court's intervention" and instead ask follow-up questions designed to show that Minicozzi's story was "fabricated." Counsel also testified that he did not object

to Minicozzi's testimony about her life being "ruined" and about being "traumatized" and having to "undergo intense therapy" because, "by this point in time, she was on the stand for a minute; and I think it was clear that she was overdramatizing her relationship, and whatever she said that [Merritt] did to her" and "trying [to] throw dirt on [] Merritt."

When asked about Minicozzi's testimony about the daughter's doctor, counsel testified that he viewed Minicozzi's "statements attributed to the doctor about having concerns" as "clearly hearsay," but explained that he chose not to object because "again, [] Minicozzi … was dramatic about everything" and there was "nothing to support" her testimony, which would make the jury "wonder about her credibility" and see that "she was doing whatever she could" to help convict Merritt. Counsel also explained that Minicozzi "broke down in tears one time or two" on the stand, so he did not want "to be mean to her" or "try to beat her up," elaborating that he "probably" could have "been more aggressive towards her," but he "wasn't going to give her another reason to cry, another reason to try

15

to draw more sympathy."

(b)   Merritt argues that counsel's approach to dealing with Minicozzi's testimony about Merritt's violence against her, the effect Merritt's crimes had on her, and the doctor's perception of Merritt at the appointment constituted ineffective assistance of counsel because counsel should have objected, rather than ask follow-up questions, once Minicozzi gave this testimony.   Even assuming an objection to each of these portions of Minicozzi's testimony would have been successful, trial counsel's strategy of choosing not to object was not objectively unreasonable, as explained below.

(i)  As to Minicozzi's testimony about Merritt's violence toward her, although her answer surprised counsel, eliciting an unexpected response is not necessarily deficient performance, especially when counsel had no reason to anticipate the response based on his reasonable preparation for that witness's cross-examination. Counsel's decision to ask Minicozzi about Merritt's reputation for violence was based on information his client gave him, and Minicozzi herself admitted that she had not told anyone about the violence

before that testimony. See *Pritchett v. State*, 314 Ga. 767, 786 (2022) ("[A]lthough counsel's question led to an unanticipated result, Pritchett has failed to demonstrate that the decision to ask the question fell outside the wide range of reasonable professional conduct."); *Watkins v. State*, 285 Ga. 355, 357–58 (2009) (holding that counsel's decision to call a witness who counsel believed, based on pre-trial discussions, would support the defense theory, was not patently unreasonable even though "trial counsel was surprised" by the witness's testimony, which supported the State's theory of the crime). And counsel's strategic decision to deal with Minicozzi's unexpected testimony by drawing out the fact that she had never told anyone about this violence before and was motivated to share (or even fabricate) this information now because she "hate[d]" Merritt was not objectively unreasonable. See *Gomez v. State*, 301 Ga. 445, 459 (2017) (holding that counsel's decision not to object to "unexpected testimony" but instead to show the jury that the testimony was incorrect was not "patently unreasonable").

(ii) Merritt's claim that counsel provided ineffective assistance

17

by failing to object to Minicozzi's testimony that Merritt "ruined" her life and caused her "trauma" fails for similar reasons. Counsel's decision to use this testimony to emphasize Minicozzi's hatred of Merritt helped further undermine the credibility of any negative testimony she gave about him. Moreover, this testimony was focused on how Merritt's theft crimes (not the alleged murder) affected Minicozzi, and the jury was well aware of Merritt's theft crimes. Indeed, Merritt's own defense theory was predicated on showing that the effect of the theft crimes had been so devastating that it motivated two men to come to Shirley's house with guns. Thus, counsel's decision not to object to Minicozzi's testimony was not objectively unreasonable. See, e.g., *Burke*, 320 Ga. at 709 (explaining that not objecting to inadmissible testimony may be "part of a reasonable trial strategy if the objectionable evidence, for example, undermines an unfavorable witness's testimony").

(iii) As to Minicozzi's testimony about the doctor's perception of Merritt's behavior, as noted in Division 1 above, Minicozzi testified based on her own observations that at the doctor's office

18

Merritt's "demeanor was very strange" and he was "very quiet."[7] Counsel could have reasonably concluded that there was nothing to be gained by objecting to Minicozzi's testimony about the doctor's similar opinion about Merritt's "behavior" and "aura," particularly in light of counsel's strategy to avoid being too "aggressive" toward Minicozzi. Further, counsel again used this testimony to undermine Minicozzi's credibility by pointing out that she did not report Merritt's strange behavior to anyone before trial. This decision was not objectively unreasonable. See *Troutman*, 320 Ga. at 498 (holding that counsel's decision not to object to a reference to unadmitted photographs was not deficient when the jury had already heard testimony about "[t]he substance of the unadmitted photos," so "counsel had little to gain by objecting" and objecting "would serve only to highlight" the undesirable evidence).

Given all of the above, Merritt has failed to show that his trial counsel's performance related to Minicozzi's testimony was

---

[7] Merritt does not argue that counsel should have objected to this testimony.

19

deficient, and these claims of ineffective assistance of counsel fail. See *Burke*, 320 Ga. at 709.

4.  Merritt argues that counsel provided ineffective assistance during closing argument by comparing Merritt's case to two other high-profile murder cases and by displaying a PowerPoint slide with Merritt's booking photograph.

(a)  As to the first argument, Merritt failed to raise it in his motion for new trial, where he was represented by new counsel and thus "afforded the opportunity to raise claims of ineffective assistance of trial counsel through motion counsel." *Mahdi v. State*, 312 Ga. 466, 469 (2021). Although Merritt questioned trial counsel about this issue at the hearing on the motion for new trial, "questioning during the motion-for-new-trial hearing, by itself, is insufficient to amend a motion for new trial to add a claim where the trial court did not rule on the claim." *Allen v. State*, 317 Ga. 1, 12–13 (2023). And in its order denying Merritt's motion for new trial, the trial court did not address any claim that counsel provided ineffective assistance by comparing this case to two other cases.

20

Because Merritt failed to raise this claim of ineffective assistance of counsel "at the earliest practicable moment," he has forfeited this claim. Id. at 13.

(b) As to the second argument, Merritt's counsel testified at the motion for new trial hearing that he used Merritt's booking photograph in a PowerPoint slide that he displayed during closing argument. Counsel explained that there was nothing in the image indicating it was a booking photo and no one testified that the picture came from Merritt's booking. Instead, counsel explained, this was "the best photo" he had of Merritt, describing it as a "pretty decent picture" of Merritt, in which Merritt is "wearing a suit" and has a "low, nice, and clean [hair]cut." The PowerPoint slide was admitted into evidence at the motion for new trial hearing, and the photograph matches counsel's description of it.

There is no evidence that the photograph itself indicated that it was a booking photo, that the jury knew it was a booking photo, or that it was an otherwise prejudicial photo. Counsel's decision to use this photograph, which counsel described as a "pretty decent

21

picture" of Merritt, in his closing argument was not objectively unreasonable. See *Anthony v. State*, 311 Ga. 293, 298 (2021) (explaining that "[w]ith respect to closing argument, defense counsel is permitted wide latitude" and is not ineffective simply because another attorney might have made a different choice).

5. Merritt argues that he is entitled to a new trial because his legs were shackled throughout trial and the trial court failed to make any specific findings at trial justifying the shackling. Because Merritt did not object to his shackling at trial, this claim is not preserved for appellate review. See *Munn v. State*, 313 Ga. 716, 724 (2022).[8]

6. Merritt claims that the State violated *Brady v. Maryland*, 373 US 83 (1963), by failing to disclose a second cartoon related to Merritt's theft convictions. At the motion for new trial hearing, Merritt's trial counsel testified that during the murder trial, he

---

[8] Although Merritt has not preserved this claim for appellate review, we remind trial courts that "a defendant's Fifth and Fourteenth Amendment due process rights prohibit the use of physical restraints … absent a trial court determination that they are justified by a state interest specific to a particular trial." *Tavarez v. State*, 319 Ga. 480, 487 n.7 (2024).

received a message from the attorney who represented Merritt in his theft case stating that a second cartoon related to Merritt's theft crimes had been sent to that attorney while Merritt was in Tennessee and that attorney had given the cartoon to law enforcement. Merritt's trial counsel did not raise the issue of the second cartoon when he learned about it at trial, nor did Merritt's post-conviction counsel raise a claim in Merritt's motion for new trial that trial counsel was ineffective for failing to argue at trial that the State violated *Brady* by failing to disclose the cartoon.[9]

Because Merritt learned about the second cartoon during his trial, but failed to raise a claim that the State's alleged suppression of this cartoon violated *Brady* until this appeal, this claim is waived. See *Battle v. State*, 301 Ga. 694, 697–98 (2017) ("Battle does not dispute that he did not raise this *Brady* claim at trial or in his motion for

---

[9] Although Merritt did not raise a claim under *Brady* in his motion for new trial, the second cartoon was discussed at the motion for new trial hearing as support for Merritt's claim that his trial counsel provided ineffective assistance by failing to call as a witness the lawyer who represented him in the theft case. The court rejected this claim in its order denying Merritt's motion for new trial, and Merritt does not raise this claim on appeal.

new trial, as amended; therefore, he has waived the right to raise this objection in the present appeal.").

7. Merritt's final claim—that he is entitled to a new trial due to the cumulative prejudicial effect of all the instances of deficient performance on the part of trial counsel and trial court errors—fails because he has not demonstrated a single instance of deficient performance or trial court error; thus, there is nothing to consider cumulatively. See *Burke*, 320 Ga. at 713.

*Judgment affirmed. All the Justices concur.*