313 Ga. 436
FINAL COPY

S22A0053. GRAHAM v. THE STATE.

MCMILLIAN, Justice.

In February 2019, Haleem Graham was tried jointly with Brantley Washington and Chrishon Siders and found guilty of felony murder, home invasion in the first degree, and other crimes in connection with the shooting death of Seine Yale Jackson.[1] On

---

[1] The crimes occurred on January 6, 2016. In May 2016, a Fulton County grand jury indicted Graham, Washington, and Siders for participation in criminal street gang activity (Count 1), malice murder (Count 2), felony murder (Counts 3-7), first degree home invasion (Count 11), aggravated assault with a deadly weapon (Count 12), false imprisonment (Count 13), first degree burglary (Count 14), and possession of a firearm during the commission of a felony (Count 15). The grand jury separately indicted Graham and Siders on charges of possession of a firearm by a convicted felon (Counts 16-18) and felony murder predicated on those felonies (Counts 8-10). At a joint trial held from February 19 to 28, 2019, the jury found Graham guilty of Counts 3-6, 8-9, and 11-17, but not guilty of Count 2. The trial court nolle prossed Counts 1 and 7. The jury also found Washington guilty of Counts 2-6 and 11-15 and Siders guilty of Counts 2-6, 10-15, and 18. We previously affirmed Washington's convictions. See *Washington v. State*, 312 Ga. 495 (863 SE2d 109) (2021). Siders's convictions are not at issue in this appeal. On March 1, 2019, the trial court sentenced Graham to serve life in prison without the possibility of parole for Count 4, life in prison for Count 11 (to run consecutively to Count 4), ten years in prison for Count 13 (to run consecutively to Count 11), and fifteen years in prison for Count 17 (to run consecutively to Count 13). The

appeal, Graham asserts that the evidence was insufficient to sustain his convictions and that he received constitutionally ineffective assistance of trial counsel for failing to object to testimony from a detective that, based on his investigation, he believed that Graham and his co-defendants committed the crimes. We affirm.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial with respect to Graham showed that on January 5, 2016, the day before the shooting, Graham, Washington, and Siders arrived together at a Best Western hotel in Walterboro, South Carolina around 1:28 p.m. in a red Pontiac Grand Prix. Hotel surveillance video recordings depicted the vehicle entering the parking lot and three individuals, identified by Detective Scott

remaining counts were merged for sentencing purposes or vacated by operation of law. The final disposition was filed on March 5, 2019, and subsequently amended on January 5, 2021, to reflect that Graham was sentenced as a recidivist under OCGA § 17-10-7 (a). Graham timely filed a motion for new trial, which he amended through new counsel on February 11, 2020, and October 27, 2020. The trial court conducted a joint hearing on the defendants' motions for new trial on November 2, 2020. On January 28, 2021, the trial court denied Graham's motion for new trial, as amended, and Graham timely appealed. The case was docketed to the term of this Court beginning in December 2021 and submitted for a decision on the briefs.

Berhalter as the defendants, exiting the car. Additional video recordings showed the car leaving the parking lot around 8:21 that evening. Chris Treadwell, a Taliaferro County[2] sheriff's deputy, testified that he conducted a traffic stop on a red Pontiac Grand Prix with South Carolina tags around 11:27 p.m. as it headed to Atlanta and cited Graham, who was driving, for speeding. Two other men were in the vehicle.

Several hours later, at approximately 2:00 a.m., police officers responded to a call of shots fired at a rental unit behind a house on Glen Iris Drive in Fulton County.[3] The responding officers found Jackson dead. He had been gagged with a belt and necktie, "hog-tied" with extension cords, and shot in the back of the head. Investigation at the scene revealed no signs of forced entry, but Jackson's home appeared to have been ransacked. Officers collected

---

[2] Taliaferro County is approximately 90 miles east of Atlanta along Interstate 20.

[3] The Best Western hotel in Walterboro is 249 miles from Glen Iris Drive, with a drive time of approximately four hours and twelve minutes.

an empty clear jar emitting the odor of fresh marijuana.[4] The medical examiner who conducted the autopsy concluded that Jackson suffered wounds consistent with being bound and gagged and that he had died from any one of four gunshots to the head.

Meyonta Murphy testified that when she visited her mother, who lived in another rental unit on the same property on Glen Iris Drive, at approximately 1:45 a.m. on January 6, 2016, she noticed an unfamiliar red Pontiac with two people inside idling in front of the house. As she left her mother's home about ten minutes later, Murphy saw one person remain in the front passenger seat of the car while the other exited the car and passed by her as he walked up the driveway toward the house. Murphy took note of the vehicle's South Carolina license plate number before she left. Soon after, Murphy's mother heard nearby gunshots and called 911. Murphy told investigating officers about her observations of the red Pontiac and the man she encountered, whom she later identified in a

---

[4] Later GBI testing of the jar showed a fingerprint match for Washington.

photographic line-up as Siders.

Jackson's brother testified that Siders was always asking Jackson to "front" him drugs without payment, but Jackson continued to do business with him because Siders was related to Jackson's uncle. Jackson's friend, Marc Huewitt, testified that Jackson had visited him just hours before the shooting. Jackson told Huewitt that he was planning to meet with a man related to Jackson's uncle later that evening and was "very concerned" because he had a bad feeling about the man.

Detective Scott Demeester, who was qualified as an expert in cell phone data interpretation and cell site analysis, testified regarding data recovered from the defendants' cell phones. A cell phone number associated with Washington — but identified in Jackson's phone with Siders's nickname — called Jackson's phone on the morning of January 5; after that call ended, the same cell number called Graham's phone. At 6:39 p.m., Washington's phone texted an unidentified phone number, stating, "This Brantley. Call me asap. I'm ready to buy that thing back from you. I got the money."

When Washington's phone called Jackson's phone around 7:45 p.m., Washington's phone was near the Best Western hotel before leaving shortly thereafter and traveling in a northwestern direction. At 11:23 p.m., Siders's phone was near Taliaferro County, approximately two hours and thirty minutes from the Best Western. At 11:45 p.m., Washington's phone sent a text to Jackson, stating, "Got a speeding ticket lol." When Washington's phone called Jackson's phone at 1:08 a.m., the phone was near Glen Iris Drive. That call was the last call ever made from Washington's phone. The phone then remained stationary near Interstate 20 in DeKalb County and received numerous calls that went unanswered. Graham's and Siders's phones placed various calls to each other between 1:10 and 1:48 a.m. while they were in the area of Glen Iris Drive. Approximately one hour after the shooting was reported, Siders's phone was on Interstate 20, heading east away from Atlanta. The next time Graham's and Siders's phones were used was in Walterboro on the morning of January 6.

Additional hotel surveillance video showed that the Pontiac

entered the Best Western parking lot at 6:20 on the morning after the shooting and that three men immediately unloaded what appeared to be heavy bags from the Pontiac. The State also introduced into evidence a receipt showing that Graham had checked into a room at the Best Western around 1:28 p.m. on January 5, 2016, and checked out at 10:00 the following morning.

Siders, the only defendant to testify at trial, told the jury that he and Washington were part of a musical group that Graham managed and that they met in South Carolina on January 5, 2016, to work in a music studio. According to Siders, that evening, they decided to drive to Atlanta for a promotional photo shoot, but Washington stayed at the hotel because he became ill. Siders used to purchase drugs from Jackson, and while he and Graham were in Atlanta, he called Jackson to buy "some smoke." However, Huewitt answered Jackson's phone that evening and told him to come to Jackson's house. Siders claimed that when he arrived, he found Huewitt outside and told him that he wanted "an eighth." Huewitt then responded, "An eighth? Man, I thought you wanted some

7

weight. We don't got no eighth," before walking away. Siders testified that he then returned to the car and told Graham that Huewitt was "acting really funny just now," and they went to a nearby club where they stayed for a short while before returning to South Carolina.

1. Graham asserts that the circumstantial evidence was insufficient to sustain his convictions. We are not persuaded.

When evaluating the sufficiency of the evidence under the Fourteenth Amendment to the United States Constitution, we view the evidence presented at trial in the light most favorable to the jury's verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). In doing so, this Court does not reweigh the evidence. See *Ivey v. State*, 305 Ga. 156, 159 (1) (824 SE2d 242) (2019). And "[w]e leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Smith v.*

*State*, 308 Ga. 81, 84 (1) (839 SE2d 630) (2020).

Under Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis — only those that are reasonable." *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted; emphasis in original). And, "[w]here the jury is authorized to find the evidence sufficient to exclude every reasonable hypothesis except that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law." *Anglin v. State*, 312 Ga. 503, 506-07 (1) (863 SE2d 148) (2021) (citations and punctuation omitted).

Graham argues that Murphy was the only witness and that she testified that she only saw two people in the Pontiac just before the shooting and that calls between Graham's and Siders's phones

9

around the time of the crimes indicate that Graham was not the second person that Murphy saw. This argument, however, ignores that Washington's fingerprint was found in Jackson's house, which is consistent with Washington being inside the house at the time that Murphy saw the two people in the car, after which one of them exited the car and walked toward the house. Siders's testimony is also consistent with Siders exiting the car to walk toward the house, leaving Graham in the car. And the phone records show that both Graham's and Siders's phones were in the area of Jackson's home around the time of the murder. Based on the evidence as a whole, the jury was authorized to believe that Siders was calling Graham about the commission of the crimes and reject Graham's alternative hypothesis that Siders called Graham for an unrelated reason immediately before the crimes.

Contrary to Graham's assertion, the State presented evidence not only of Graham's presence with his co-defendants at the time of the crimes, but also of his conduct and companionship with them during the critical hours before and after the murder. The evidence

indicated that the day before the murder, Washington or Siders spoke with Jackson shortly before calling Graham. Graham then drove the three men to the Best Western hotel and checked them into one room under his name. That evening, Graham drove the three men to Atlanta. Graham's and Siders's phones were in the area at the time Jackson was killed, and Graham's phone called Siders's phone approximately six minutes before Murphy's mother called 911 to report the sound of gunshots. Hotel surveillance video showed the Pontiac return to the Best Western early the following morning and three men unloading what appeared to be heavy bags. Graham checked out of the hotel a few hours later. This evidence authorized the jury to reject other hypotheses and find beyond a reasonable doubt that Graham participated in or aided Siders and Washington from their initial contact with Jackson through and after the crimes and was thus a party to the crimes for which he was convicted. See OCGA § 16-2-20 (defining parties to a crime); *Poole v. State*, 312 Ga. 515, 518-19 (863 SE2d 93) (2021) ("[C]riminal intent is a question for the jury, and it may be inferred from that person's

11

conduct before, during, and after the commission of the crime." (citation and punctuation omitted)); *McKie v. State*, 306 Ga. 111, 115-16 (829 SE2d 376) (2019) (jurors are entitled to draw reasonable inferences "based on their own common-sense understanding of the world" that "are ordinarily drawn by ordinary [people] in the light of their experience in everyday life" (citation and punctuation omitted)).

2. Graham also asserts that his trial counsel provided constitutionally ineffective assistance when he failed to object to the lead detective's testimony that he believed that Graham committed these crimes. We disagree.

To prevail on this claim, Graham has the burden of proving both that his lawyer's performance was deficient and that he was prejudiced as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Graham must show that his counsel acted "in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms." *Stuckey v. State*, 301

12

Ga. 767, 771 (2) (804 SE2d 76) (2017). This showing requires Graham to "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015) (citation and punctuation omitted). To establish prejudice, Graham must establish "a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different." *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016) (citation and punctuation omitted). If Graham fails to satisfy either prong of the *Strickland* test, we need not examine the other. See *Redding v. State*, 297 Ga. 845, 850-51 (5) (778 SE2d 774) (2015).

Here, Graham points to an exchange in which the prosecutor asked Detective Berhalter: "And after receiving all the information that you just testified to, both on Friday as well as today, who did you conclude were the perpetrators of the homicide?" The detective then named each of the three co-defendants, including Graham.

13

There was no objection. However, the record shows that in cross-examining Detective Berhalter, Graham's trial counsel pursued a line of questioning designed to highlight weaknesses in the officers' investigation, including that the search of Jackson's apartment missed two cell phones that were later found by a member of Jackson's family, as well as a shell casing later found by someone cleaning the apartment. Counsel was also able to elicit testimony from Detective Berhalter that "[t]here are obviously times, especially with this case, where we just didn't find everything. You know, we're human just like everyone else. And the thing that we can do is once we correct the mistake, we learn from it and just do a better job next time."

"A decision to refrain from objecting to testimony in favor of impeaching a witness or showing inconsistencies in the evidence is a trial strategy and, if reasonable, will not support an ineffectiveness claim." *Koonce v. State*, 305 Ga. 671, 673 (2) (b) (827 SE2d 633) (2019). At the motion for new trial hearing, when asked whether he considered objecting, trial counsel testified:

At the time, no. My thought process at the time was that it was obvious that Detective Berhalter believed that all three of the co[-]defendants were involved in the incident and took out the warrants for them, and that kind of fell in line with the defense strategy being that Detective Berhalter led a very poor investigation of the crime; basically just made assumptions about who all was involved and how they participated; and I thought it was appropriate to leave that as it was because of the argument being made that, well, of course he thought they did it. That's obvious. And all of the oversights that he made during his investigation because he had already developed who he believed was the suspect.

We cannot say that this trial strategy is patently unreasonable. See *Shaw v. State*, 307 Ga. 233, 251 (6) (a) (835 SE2d 279) (2019) (decision to attack the thoroughness of law enforcement's investigation was part of a reasonable trial strategy); *Brown v. State*, 302 Ga. 454, 461-62 (2) (b) (807 SE2d 369) (2017) ("We have explained in the context of defense counsel's failure to object to an investigator's bolstering testimony that a sound defense strategy is to show that the law enforcement investigation that led to the prosecution was not as thorough or objective as it should have been[.]" (citation and punctuation omitted)).

Moreover, Graham is unable to show that any deficiency in

15

trial counsel's failure to object likely affected the outcome of the trial because the jury already knew that the detective had investigated the crimes and obtained a warrant for Graham's arrest. See *Tanner v. State*, 303 Ga. 203, 209 (3) (811 SE2d 316) (2018) ("[A]lthough it may have been improper for the detective to share his subjective belief that Appellant would go to prison . . . , any rational juror would have guessed that the detective believed as much without being told. As we have explained before, such comments upon the patently obvious generally pose little, if any, danger of prejudice." (citation and punctuation omitted)). Accordingly, this enumeration of error fails.

*Judgment affirmed. All the Justices concur.*

Decided March 8, 2022.

Murder. Fulton Superior Court. Before Judge Millender.

*Zell & Zell, Rodney S. Zell*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Juliana Y. Sleeper, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Mark S. Lindemann, Assistant Attorneys General*, for appellee.