320 Ga. 367
FINAL COPY

S24A0607. SIDERS v. THE STATE.

BOGGS, Chief Justice.

Appellant Chrishon Siders was tried jointly with Haleem Graham and Brantley Washington and was convicted of murder and other crimes in the shooting death of Seine Yale Jackson. Appellant contends that the evidence was constitutionally and statutorily insufficient to support his convictions, that the trial court abused its discretion in admitting certain evidence, that the trial court plainly erred in failing to give a jury instruction, and that the trial court erred in responding to a jury question. As explained below, these claims are without merit, and we affirm.[1]

---

[1] The crimes occurred on January 6, 2016. In May 2016, a Fulton County grand jury returned an indictment against Appellant, Graham, and Washington, charging Appellant specifically with participation in criminal street gang activity (Count 1), malice murder (Count 2), six counts of felony murder (Counts 3-7, 10), home invasion in the first degree (Count 11), aggravated assault with a deadly weapon (Count 12), false imprisonment (Count 13), burglary in the first degree (Count 14), possession of a firearm during the commission of a felony (Count 15), and possession of a firearm by a convicted felon (Count 18). Counts 1 and 7 were not presented to the jury and

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following with respect to Appellant. Sometime before 1:45 a.m. on January 6, 2016, Appellant, Graham, and Washington, drove to Jackson's home, a

---

were later nolle prossed. At a joint trial held from February 19 to 28, 2019, the jury found Appellant guilty of all counts. We previously affirmed Graham's and Washington's convictions. See *Graham v. State*, 313 Ga. 436 (870 SE2d 424) (2022); *Washington v. State*, 312 Ga. 495 (863 SE2d 109) (2021). On March 1, 2019, the trial court sentenced Appellant to serve life in prison without the possibility of parole on Count 2, life in prison on Count 11 (to run consecutively to Count 2), ten years in prison on Count 13 (to run consecutively to Count 11), five years in prison on Count 15 (to run consecutively to Count 13), and five years in prison on Count 18 (to run consecutively to Count 15). The remaining counts were merged for sentencing purposes or vacated by operation of law. The final disposition was filed on March 5, 2019. Appellant timely filed a motion for new trial, which he amended through new counsel on February 12, 2020, November 12, 2020, and March 11, 2021. The trial court conducted hearings on Appellant's motion for new trial on November 2 and 13, 2020, and March 12, 2021. The trial court denied Appellant's motion for new trial, as amended, in an order entered August 2, 2021. Appellant did not file a timely notice of appeal and instead filed a motion for out-of-time appeal on December 29, 2021, which the trial court granted, and Appellant filed a timely notice of appeal. That appeal was docketed in this Court on March 1, 2022. However, this Court subsequently eliminated the use of the judicially created out-of-time appeal procedure in the court of conviction. See *Cook v. State*, 313 Ga. 471 (870 SE2d 758) (2022). This Court thus entered an order vacating the trial court's order granting Appellant's motion for out-of-time appeal, with direction that the trial court dismiss the motion. See *Siders v. State*, Case No. S22A0726 (May 3, 2022). Appellant then filed a petition for habeas corpus in the Superior Court of Butts County on August 12, 2022, and on November 17, 2023, the habeas court granted relief, authorizing Appellant to file an out-of-time appeal. Appellant filed a timely notice of appeal on December 15, 2023. The case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

2

duplex on Glen Iris Drive in Fulton County, to purchase drugs. Appellant was related to Jackson and had purchased drugs from him before. Appellant, Graham, and Washington were driving a red Pontiac Grand Prix that was registered to Appellant's mother.

Meyonta Murphy, whose mother lived in the other unit of the duplex, saw a Pontiac and Appellant near the duplex shortly before the murder. Specifically, Murphy testified that she went to visit her mother early on the morning of January 6 and that when she arrived around 1:45 a.m., she saw a "burgundy-ish red" Pontiac Grand Prix, with two men inside the car, idling in front of the duplex. As Murphy left her mother's apartment about ten minutes later, she saw one person still in the car and a man coming around the car from the driver's side. The man coming from the driver's side began to walk up the driveway, and Murphy passed him as she was walking back to her car. Murphy took note of the vehicle's South Carolina license plate number before she left. Shortly thereafter, Murphy's mother heard nearby gunshots and called 911. Murphy later told investigating officers about her observations of the Pontiac and the

3

man she encountered, whom she later identified in a photographic lineup as Appellant.

Within minutes of the 911 call, police officers arrived at Jackson's home and found the door ajar and Jackson dead; he had been gagged with a belt and necktie, "hog-tied" with extension cords, and shot in the back of the head. Investigation at the scene showed no signs of forced entry or recent damage to the door, but the apartment appeared to have been ransacked. Officers collected an empty clear jar emitting the odor of fresh marijuana. Later GBI testing of the jar found a fingerprint match for Washington. An autopsy revealed that Jackson suffered wounds consistent with being bound and gagged and had died from any one of four fatal gunshots to the head.

The day before the shooting, Appellant, Graham, and Washington arrived together at a Best Western hotel in Walterboro, South Carolina, around 1:28 p.m. in a red Pontiac Grand Prix. Hotel surveillance video recordings depicted the vehicle entering the parking lot and three individuals, identified by Detective Scott

4

Berhalter as Appellant, Graham, and Washington, exiting the car. Additional video recordings showed the car leaving the parking lot around 8:21 p.m. that evening. The State also presented evidence that a Taliaferro County sheriff's deputy conducted a traffic stop on a red Pontiac Grand Prix with South Carolina tags around 11:27 p.m. as it headed toward Atlanta. The deputy cited Graham, who was driving, for speeding. The deputy testified that there were three individuals in the car, and video footage from the deputy's dash camera was introduced into evidence and played at trial.

Marc Huewitt, Jackson's childhood friend, and Leeroy Ellis, Jackson's younger brother, who was close with Jackson, each testified about statements Jackson made to them about Appellant. Ellis testified that Appellant was always asking Jackson to "front" him drugs without payment, but Jackson continued to do business with him because Appellant was related to Jackson's uncle. Ellis also testified that Jackson said he was worried about dealing with Appellant; that Appellant was "bad news"; and that he would not have dealt with him if not for the family connection. Huewitt

5

testified that he was aware that Jackson sold drugs and that Jackson had visited him just hours before Jackson was killed. Jackson told Huewitt that he was planning to meet with a customer related to Jackson's uncle later that evening and was "very concerned" because he had a bad feeling about the man, who "had a bad aura."

Detective Scott Demeester, who was qualified as an expert in cell phone data interpretation and cell-site analysis, testified regarding data recovered from the defendants' cell phones. A cell phone associated with Washington[2] called and texted Jackson's cell phone several times in the days leading up to the shooting. When Washington called Jackson around 7:45 p.m. on January 5, 2016, Washington was near the Best Western hotel before leaving shortly thereafter and traveling in a northwestern direction. At 11:23 p.m., Appellant's cell phone was near Taliaferro County, approximately

---

[2] Although the phone was registered to Washington, Jackson had the number stored in his contacts list with Appellant's nickname. Appellant testified that he had two phones with him on January 5 and 6; that one of the phones was the one that Detective Demeester identified as registered to Washington; and that he let Washington use that phone.

two hours and thirty minutes from the Best Western. At 11:45 p.m., Washington's cell phone sent a text to Jackson, stating, "Got a speeding ticket lol." When Washington called Jackson at 1:08 a.m., Washington's cell phone was near Glen Iris Drive. That call was the last call ever made on Washington's cell phone. After that point, the cell phone remained stationary near Interstate 20 in DeKalb County and received numerous calls that went unanswered, consistent with having been "dumped" out of a vehicle. Appellant's and Graham's phones placed various calls to each other between 1:10 and 1:48 a.m. while they were in the area of Glen Iris Drive. Approximately one hour after the shooting was reported, Appellant's cell phone was on Interstate 20, heading east away from Atlanta. The next time Graham's and Appellant's cell phones were used was in Walterboro on the morning of January 6.

Additional hotel surveillance video showed that the Pontiac entered the Best Western parking lot at 6:20 a.m. on the day after the shooting. Although the video did not show who exited the car, it did show three men unload what appeared to be heavy bags from

the Pontiac. At 8:01 a.m., the three men returned to the car and left the hotel. The car then returned at 9:56 a.m. before leaving for the final time at 10:01 a.m. The State also introduced a receipt showing that Graham had checked into a room at the Best Western hotel around 1:28 p.m. on January 5, 2016, and checked out at 10:00 a.m. the following day.

Appellant, the only defendant to testify at trial, told the jury that Jackson was his friend, that he knew Jackson through his cousin, and that he had occasionally purchased drugs from Jackson. Appellant also testified that he and Washington were part of a musical group that Graham managed; that on January 5, 2016, he and Graham drove from their homes in New Jersey to work in a music studio with Washington, who lived in South Carolina. After arriving in South Carolina that evening, the three men decided to drive to Atlanta for a promotional photo shoot that Graham's cousin "Rock" had set up, but Washington stayed at the hotel because he became ill with "flu-like symptoms . . . throwing up all over the place." On the way to Atlanta, Appellant and Graham were in

8

Appellant's mother's car with Graham driving when they were stopped for speeding. Appellant meant to text Rock to tell him that they had been stopped for speeding, but he accidentally texted Jackson because Appellant did not have the names saved in his phone and the phone numbers for both Rock and Jackson started with "404."

When Appellant and Graham arrived in Atlanta, they went to a hotel to see Rock and had a brief photo shoot. Afterward, Appellant called Jackson to buy "some smoke"; Huewitt answered Jackson's phone and told him to come to an address on Glen Iris. The address was Jackson's address, but Appellant had never been there before. When Appellant arrived at Jackson's duplex around 1:00 a.m., he parked the car on the street in front of the duplex. While he was sitting in the car, a woman pulled up and parked behind him. He got out of the car at the same time the woman got out of hers, and he followed behind her as she walked up the driveway. The woman went to the front door of the duplex, but he was not sure where to go. He saw someone light a lighter toward the back of the duplex,

9

and as he walked in that direction, he saw Huewitt standing outside and told Huewitt that he wanted "an eighth." Huewitt responded, "An eighth? Man, I thought you wanted some weight. We don't got no eighth," before walking away. Appellant testified that he then returned to the car and called Graham twice around 1:10 a.m. and 1:18 a.m. and told him that Huewitt was "acting really funny just now." Appellant then went to a nearby club for a short while, but he left the club before 1:48 a.m., went to pick up Graham, and he and Graham returned to South Carolina. Appellant testified that he did not have a gun while he was at Jackson's duplex and that he did not murder "his friend."

2.   Appellant contends that the trial court erred in denying his motion for directed verdict of acquittal as to malice murder, felony murder, home invasion, and burglary and that the State failed to prove beyond a reasonable doubt that he knowingly committed any of the crimes for which he was convicted as a matter of constitutional due process. He also asserts that the State failed to exclude the reasonable hypothesis that Appellant did not knowingly

10

commit these crimes as a party to the crime or that Huewitt or another person committed these crimes. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").

Appellant asserts that in considering his challenges to the sufficiency of the evidence, we must view the evidence as reasonable jurors would. However, in conducting a review of the constitutional sufficiency of the evidence, we view the evidence in the light most favorable to the verdicts. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). This is also the standard we apply when reviewing a trial court's order denying a motion for directed verdict. See *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018).[3] Our review of the constitutional sufficiency of the evidence

---

[3] By contrast, we consider the evidence as reasonable jurors would in connection with questions involving harmless error analysis or prejudice stemming from deficient performance of counsel. See, e.g., *Wood v. State*, 316 Ga. 811, 812 n.2 (890 SE2d 716) (2023).

"leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Wilkerson v. State*, 317 Ga. 242, 245 (892 SE2d 737) (2023) (cleaned up).

When properly viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted.[4] See *Jackson*, 443 U.S. at 319. See also OCGA § 16-2-20 (defining parties to a crime); *Poole v. State*, 312 Ga. 515, 518-519 (863 SE2d 93) (2021) ("Criminal intent is a question for the jury, and it may be inferred from that person's conduct before, during, and after the commission of the crime." (cleaned up)); *Shealey v. State*, 308 Ga. 847, 850 (843 SE2d 864) (2020) (affirming convictions where there was ample evidence from which the jury could find that appellant aided,

---

[4] To the extent Appellant challenges the sufficiency of the evidence as to all of the jury's verdicts, his challenges to the felony murder, aggravated assault, and burglary counts are moot because they merged or were vacated by operation of law and no sentence was entered on them. See *Beamon v. State*, 314 Ga. 798, 800 n.2 (879 SE2d 457) (2022).

12

abetted, and encouraged the crimes and shared a common criminal intent with those who shot the victim); *McKie v. State*, 306 Ga. 111, 115 (829 SE2d 376) (2019) (jurors are entitled to draw reasonable inferences "based on their own common-sense understanding of the world" as "ordinarily prudent persons would make in light of their everyday experience and knowledge of human conduct and behavior" (cleaned up)).

And although the evidence was circumstantial, it authorized the jury to reject as unreasonable Appellant's testimony that neither he nor his co-defendants were at Jackson's duplex very shortly before Jackson was shot, as well as the theory that Huewitt or some other unknown person committed the crime. The State's evidence showed that Appellant was walking toward Jackson's unit shortly before Jackson was killed; the three co-defendants were near Jackson's duplex around the same time; even though Appellant testified that Washington did not travel to Atlanta, Washington's fingerprint was found on a jar in Jackson's home; Appellant called Graham approximately six minutes before Murphy's mother called

13

911; the co-defendants were together in the hours before and after the murder; Appellant or Washington communicated with Jackson in the hours before the crime; and Jackson had planned to meet someone that evening for a drug transaction. Additionally, Appellant admitted he visited Jackson to purchase drugs shortly before the murder. Hotel surveillance video showed the Pontiac returning to the Best Western early the following morning and three men unloading what appeared to be heavy bags. This evidence authorized the jury to reject other hypotheses and find beyond a reasonable doubt that Appellant participated in or aided Graham and Washington through and after the crimes and thus was a party to the crimes for which he was convicted. See *Smith v. State*, 315 Ga. 357, 358 (882 SE2d 289) (2022) (explaining that "where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law" (cleaned up)); *Peacock v. State*, 314 Ga. 709, 714 (878 SE2d 247) (2022) (holding that the circumstantial

14

evidence presented at trial was sufficient under OCGA § 24-14-6, as it authorized the jury to reject appellant's alternative hypothesis that someone else killed the victims, given his "shifting stories that conflicted with other evidence"). Moreover, the jury was authorized to disbelieve Appellant's testimony that he left Jackson's apartment before the shooting occurred. See *Fitts v. State*, 312 Ga. 134, 143 n.9 (859 SE2d 79) (2021) (noting that, if disbelieved by the jury, the defendant's testimony denying involvement in the crimes could have served as direct evidence of guilt).

3. Appellant contends that the trial court abused its discretion in admitting four exhibits consisting of posts from Appellant's Facebook and Instagram accounts over his relevancy objections. During its case-in-chief, the State offered into evidence two photographs posted on Appellant's Facebook page. One of the photographs depicts Appellant, Washington, and Graham standing side by side facing the camera in what appears to be a room in a home. Appellant is gesturing toward the side with his index finger extended and his thumb pointing up, which the trial court described

15

as "pointing at the person standing next" to him. Washington is standing in a similar posture, and Graham has his fingers and the palms of his hands together in front of his chest, which the trial court characterized as "praying hands." The other photograph depicts Washington and Appellant sitting in the front seat of a red car, holding multiple fifty and one hundred dollar bills.

During the State's cross-examination, Appellant testified that he probably posted photographs from the Atlanta photo shoot on January 5 to his Instagram account, which was under the name "BossmanTayauo." During the State's re-cross-examination of Appellant, it offered into evidence a photograph and a "meme" posted on Appellant's Instagram account. The Instagram photograph depicts Appellant, Graham, and three other individuals sitting indoors; Appellant and one of the individuals are holding their hands out in a "pointing" fashion, although Appellant testified that he is indicating that he is holding a gun. The photograph is captioned, "It's sum shooterz in my Hse. . Whole buncha whole buncha shootaz in mu [house emoji] . . . [gun and explosion emojis]."

16

Appellant testified that the caption refers to a popular song by an Atlanta rap artist. The "meme" shows a person in a "Jason" mask[5] wearing what appears to be a blood-streaked white jacket and is captioned "I'm the kind of friend who will help you hide a dead body, but if you betray me, just remember: I KNOW HOW TO HIDE A DEAD BODY." Appellant testified that he posted the meme around Halloween.

(a) Appellant argues that the three photographs and the meme were not relevant. See OCGA § 24-4-401 ("relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").[6] "The

_____

[5] Appellant identified the mask as a "Jason" mask, after a character in a horror movie.

[6] Appellant also argues that the admission of the Facebook photographs was unduly prejudicial. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). But because we conclude that the trial court did not abuse its discretion in overruling the relevance objection to the Facebook photographs, we need not address this argument. We note that Appellant does not assert on appeal any argument that can be construed as a claim that the trial court abused its discretion in not excluding the Facebook photographs under OCGA § 24-4-403. We address below his claim that the trial

17

standard for relevant evidence is a liberal one, and such evidence is generally admissible even if it has only slight probative value." *Anthony v. State*, 303 Ga. 399, 408 (811 SE2d 399) (2018) (cleaned up). However, the three photographs, which showed that the co-defendants had a relationship with each other, are relevant here, where the co-defendants were alleged to have committed the crimes together and Appellant disputed that he shared a common criminal intent with his co-defendants. See generally *Rooks v. State*, 317 Ga. 743, 756 (893 SE2d 899) (2023) (explaining that where a defendant suggests that he was merely present when a co-defendant or someone else killed the victim, the State has to prove that the defendant shared a common criminal intent with his co-defendants). Additionally, the meme, which arguably suggested that Appellant was willing to murder a friend who betrayed him, had at least slight probative value to rebut Appellant's testimony that he would not murder a "friend." Thus, we conclude that there was no clear abuse

court plainly erred in not excluding the Instagram posts under OCGA § 24-4-403.

18

of the trial court's discretion in admitting the four exhibits over a relevancy objection. See *Jones v. State*, 315 Ga. 117, 121 (880 SE2d 509) (2022) ("We will not disturb a trial court's determination as to the admissibility of evidence absent a clear abuse of discretion." (cleaned up)).

(b) Appellant also asserts that the trial court plainly erred in admitting the four exhibits. See OCGA § 24-1-103 (d) (authorizing court to review unpreserved claims related to admission or exclusion of evidence for "plain errors affecting substantial rights"); *Gates v. State*, 298 Ga. 324, 326-327 (781 SE2d 772) (2016) (adopting federal plain-error standard for reviewing claims of unpreserved evidentiary error under OCGA § 24-1-103 (d)).[7] Appellant contends that the admission of this evidence was plain error because the State did not provide pretrial notice under OCGA § 24-4-404 (b) ("Rule 404

---

[7] To prevail on a claim of plain error, an appellant bears the burden of showing error that was not intentionally waived; that is clear or obvious; that affected the appellant's substantial rights, which generally means it must have affected the outcome of the trial court proceedings; and that seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Gates*, 298 Ga. at 327.

19

(b)"), which requires pretrial notice of evidence of "other crimes, wrongs, or acts" that are offered not "to prove the character of a person in order to show action in conformity therewith" but for "other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[8] However, as set forth above, the Facebook and Instagram posts were not being offered for any purpose listed in Rule 404 (b), and Appellant has failed to meet his burden of showing an error that is clear or obvious. See generally *Strother v. State*, 305 Ga. 838, 843-848 (828 SE2d 327) (2019) (concluding that there was no plain error in trial court not excluding statements under Rule 404 (b) despite no notice being given where statements became relevant only when appellant elicited testimony supporting his theory of defense and where statements were not introduced for any purpose listed in Rule 404 (b)). Accordingly,

---

[8] The record reflects that the State provided pretrial notice of its intent to offer the Facebook photographs into evidence, and that the State made the Instagram posts available to Appellant after it became aware of Appellant's Instagram account during his testimony.

20

Appellant has failed to meet his burden of showing plain error. See *Williams v. State*, 315 Ga. 490, 496 (883 SE2d 733) (2023) (we need not analyze all prongs of plain error review where appellant fails to establish one of them).

(c) Finally, Appellant asserts that the trial court plainly erred in not excluding the Instagram posts — the group photograph with the song lyric and the meme — because the posts "were unduly prejudicial and had scant probative force."[9] See OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). This argument fails.

"The prejudicial effect of evidence is 'unfair' if it has the capacity to lure the factfinder into declaring guilt on a ground

---

[9] Although one of the Facebook photographs and the Instagram photograph were similar in that they both depicted Appellant with at least one of his co-defendants, and Appellant was making a "pointing" or "gun" sign with his hand, Appellant does not argue that the Instagram photograph should have been excluded under Rule 403 as needlessly cumulative.

21

different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Carter v. State*, 317 Ga. 689, 694 (895 SE2d 295) (2023) (cleaned up). And we look at the evidence in the light most favorable to its admission, "maximizing its probative value and minimizing its undue prejudicial impact." *Lee v. State*, 318 Ga. 412, 419 (897 SE2d 856) (2024) (cleaned up). Here, neither the photograph nor the meme posted on Instagram contains offensive language or particularly violent or threatening images; nor do the images show anyone pointing a real gun at another person. One is a photograph of Appellant with a co-defendant and several other individuals, captioned with a popular rap lyric, and the meme contains an image from a movie. Thus, because the posts were not particularly offensive, they were unlikely to inject an improper basis for conviction. Compare *Baker v. State*, 318 Ga. 431, 446-447 (899 SE2d 139) (2024) (trial court abused its discretion under Rule 403 by admitting portion of rap video showing defendant waving a handgun pointed directly at the camera and

mimicking shooting while other men brandished guns and made hand signs). And, as set forth above, the posts were at least minimally probative to rebut Appellant's testimony that he would not shoot a friend. Accordingly, there was no clear or obvious error in the trial court's failure to sua sponte exclude the Instagram posts as unduly prejudicial under Rule 403. See *Carter*, 317 Ga. at 694-695; *Williams*, 315 Ga. at 496.

4. Appellant asserts that the trial court erred in admitting Huewitt's and Ellis's testimony about Jackson's statements to them regarding Appellant. The State filed a pretrial notice of intent to introduce the statements under OCGA § 24-8-807 ("Rule 807"), which is generally known as the residual hearsay exception. Following a pretrial hearing, the trial court entered a written ruling that the statements would be admissible.

Rule 807 provides, in relevant part:

A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
(1) The statement is offered as evidence of a material

23

fact;

(2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

Appellant first contends that the trial court's ruling failed to make specific findings about the circumstances under which the statements were made. However, he cites no authority for any such requirement, and we have previously rejected a similar claim that a trial court must explicitly determine on the record that each requirement of Rule 807 has been met. See *Smith v. State*, 311 Ga. 288, 291-292 (857 SE2d 698) (2021). Thus, this argument fails.

Appellant also contends that the State failed to establish that the following requirements of Rule 807 were met: that there were equivalent circumstantial guarantees of trustworthiness; that the statements were evidence of a material fact; that they were more probative on the point for which they were offered than any other evidence that the proponent could procure through reasonable

efforts; and that the general purposes of the rules of evidence and the interests of justice were best served by their admission.[10]

In assessing whether evidence is admissible under Rule 807, a trial court "should consider the totality of the circumstances." *Jones v. State*, 311 Ga. 455, 460 (858 SE2d 462) (2021). Here, we cannot say that the trial court abused its discretion in concluding that Jackson's statements had sufficient guarantees of trustworthiness. The record shows that Jackson made the statements to his brother, with whom he had a close relationship, and to a good friend whom he had known since childhood. Moreover, nothing indicated that Jackson had any motive to fabricate his statements. See *Kennebrew v. State*, 317 Ga. 324, 335-336 (893 SE2d 96) (2023) (hearsay statements victim made to his sister had sufficient guarantees of trustworthiness where victim had close relationship with his sister, and there was no evidence he had any motive to fabricate his statements); *Ash v. State*, 312 Ga. 771, 786 (865 SE2d 150) (2021)

---

[10] Appellant does not contend on appeal that Huewitt's and Ellis's statements were inadmissible under Rule 807 because they were "specifically covered" by another law. OCGA § 24-8-807.

25

(statements had sufficient guarantees of trustworthiness where the witness and declarant had a "close relationship" and "talked to each other daily"). Thus, the trial court did not abuse its discretion in concluding that Huewitt's and Ellis's statements had sufficient guarantees of trustworthiness.

Nor can we say that the trial court abused its discretion in concluding that the statements met the other three requirements of Rule 807. Huewitt's and Ellis's testimony established that Jackson sold drugs and that Appellant had bought drugs from Jackson before and often asked that Jackson give him more than Appellant was willing to pay for; their testimony also shed light on the relationship between Appellant and Jackson. Moreover, Huewitt's testimony was relevant to show that hours before Jackson was killed, he was planning to meet with Appellant later in the evening. Although Appellant argues that Huewitt's testimony was not more probative than the cell phone evidence, his argument ignores that the evidence related to Appellant's use of multiple cell phones, one of which was associated with Washington, was not altogether clear. Thus, the

26

trial court acted within its discretion in concluding that the statements met Rule 807's materiality requirement and that the State could not have procured other evidence about the nature of the relationship between Appellant and Jackson, particularly because Jackson was deceased. See, e.g., *Shellman v. State*, 318 Ga. 71, 77-78 (897 SE2d 355) (2024) (holding that evidence of the relationship between the defendant and the victim, including jealousy, was relevant because it shed light on the defendant's motive in committing the charged offenses); *Kennebrew*, 317 Ga. at 336. Nor has Appellant shown that the interests of justice were not best served by the admission of the statements. See *Kennebrew*, 317 Ga. at 336. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Huewitt's and Ellis's statements.

5. Appellant raises two other claims of plain error. Neither is meritorious.

(a) Appellant contends that the trial court plainly erred in responding to one of two jury questions sent out at the same time. Specifically, Appellant contends that the trial court plainly erred in

27

responding to the first question, which stated: "(1) If we suspect that one of the three was never in the house, and the murder was not preplanned prior to entering the home, and murder occurs, is the person who never entered the home guilty of murder?" Appellant asserts that the trial court responded, "(1) This is for you, the jury, to decide," and that the trial court should have included the following language: "you should consider all charges and law previously given to you including charges 29-33 and 37." However, Appellant's argument is premised on an erroneous understanding of the record, and he makes no argument challenging the response the trial court actually gave.

The record reflects that after the trial court completed its final charge to the jury, it provided the jury with a written copy of the instructions. During its deliberations, the jury sent out a written note containing the following two questions:

(1) If we suspect that one of the three was never in the house, and the murder was not preplanned prior to entering the home, and murder occurs, is the person who never entered the home guilty of murder?
(2) If the person who never entered the home is

28

guilty of the alleged felonies and a murder occurs, are they also guilty of murder that occurs during comission [sic] of felonies?

After discussing the questions with the parties outside the presence of the jury, the trial court returned the following written note to the jury:

> (1) This is for you, the jury, to decide
> (2) This is for you, the jury, to decide
> You should consider all charges and law previously given to you including charges 29-33 and 37.[11]
> By responding to your questions the Court has not intended to express any opinion upon the facts of this case, upon the credibility of the witnesses, upon the evidence, or upon the guilt or innocence of the defendants.

Because the paragraph structure of the trial court's order makes clear that the trial court gave the same response to both questions, and Appellant does not raise any argument in regard to the answer that was given to the first question, Appellant's argument fails. See *Thornton v. State*, 307 Ga. 121, 124-125 (834 SE2d 814) (2019)

---

[11] Charges 29-33 and 37 covered the following principles: party to a crime; knowledge of the defendant; mere presence; conspiracy; presence and conduct before and after the commission of the alleged offenses; and felony murder.

(where appellant's claim is directly contradicted by the record, appellant is unable to show error, much less plain error).

(b) Appellant asserts that the trial court plainly erred in failing to charge impeachment of a witness through bias toward a party in light of Ellis's and Huewitt's testimony that Appellant was "bad news" and had a "bad aura" and that Jackson would not have dealt with Appellant if not for their family connection. "In evaluating a claim that the trial court was required to give certain jury instructions, we view the charge as a whole to determine whether the jury was fully and fairly instructed." *Clark v. State*, 315 Ga. 423, 440 (883 SE2d 317) (2023) (cleaned up). Even assuming, however, that there was slight evidence supporting a charge on impeachment by bias, instructing the jury to consider witnesses' "interest or lack of interest in the outcome of the case" substantially covers the instruction on bias such that there is no error or plain error. See *Baker v. State*, 319 Ga. 456, 461-462 (902 SE2d 645) (2024); *Isaac v. State*, 319 Ga. 25, 33 (901 SE2d 535) (2024). Here, in its final instructions on the credibility of witnesses, the trial court told the

jury, among other things, that it may consider the witnesses' "interest or lack of interest in the outcome of the case." Moreover, in its preliminary instructions, the trial court told the jury that in considering "the weight and value of the testimony of any witness," it may consider "the interest of the witness in the outcome of the case, if any; [and] the relation of the witness to any party in the suit." Under these circumstances, where the charge as given covered the omitted instruction, Appellant has failed to demonstrate any clear or obvious error, and thus his claim of plain error fails. See *Baker*, 319 Ga. at 461-463.

*Judgment affirmed. All the Justices concur.*

Decided October 15, 2024 — Reconsideration denied November 14, 2024.

Murder. Fulton Superior Court. Before Judge Ingram.

*Frances C. Kuo*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Jayna Edwards, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Eric C. Peters, Assistant Attorney General*, for appellee.